**MEDTRONIC MINIMED INC., Plaintiff and Counter-defendant,**

v.

**SMITHS MEDICAL MD INC., Defendant and Counterclaimant.**

**No. CIV.A. 03–776–KAJ.**

United States District Court, D. Delaware.

April 14, 2005.

---

Counsel: Terrence P. McMahon, Esq., McDermott Will & Emery, Palo Alto, CA, Jon B. Dubrow, Esq., McDermott Will & Emery, Washington, DC, David M. Beckwith, Esq., McDermott Will & Emery, San Diego, CA, Daniel Floyd, Esq., Gibson Dunn & Crutcher, Los Angeles, CA.

Richard D. Kirk, Esq., Cheryl Siskin, Esq., The Bayard Firm, Wilmington, DE, for Defendant. Of Counsel: Anthony C. Roth, Esq., Thomas E. Nelson, Esq., Corinne A. Niosi, Esq., J. Clayton Everett, Jr., Esq., Morgan, Lewis & Bockius LLP, Washington, DC.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. Introduction

Before me is a motion for summary judgment (Docket Item ["D.I."] 175; the "Motion") filed by Medtronic Minimed, Inc. ("MiniMed") seeking summary judgment on Smiths Medical MD, Inc.'s[1] ("Smiths") First, Second, and Third Counterclaims (collectively the "Antitrust Counterclaims") (D.I. 28 at 24–26 ¶¶ 76–90).

This case commenced on August 5, 2003, when MiniMed filed a patent infringement complaint against Smiths for the infringement of United States Patent No. 6,554,-798 B1 (the " '798 patent") and United States Patent No. 5,655,065 (the " '065 patent"), both of which are directed to insulin infusion pumps. (D.I.1.) MiniMed alleges that Smiths has directly infringed the '798 and '065 patents through the making, using, offering for sale, and/or selling of a pump sold under the trademark "Cozmo,"

Karen Jacobs Louden, Esq., Julia Heaney, Esq., Kristen Healey, Esq., Philip H. Bangle, Esq., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff. Of

1. MiniMed originally filed suit against Deltec, Inc., Smiths Medical LTD, and Smiths Group PLC. (D.I. 25 at 1.) In its First Amended Complaint, MiniMed removed Smiths Medical LTD from the case and replaced it with Smiths Group North America, Inc. *Id.* On February 24, 2004, the parties entered into a stipulation dismissing without prejudice Smiths Group North America, Inc. and Smiths Group PLC and noting that Deltec Inc. had changed its corporate name to Smiths Medical MD, Inc., which is now the sole remaining defendant in this case. (D.I.38.)

that it has knowingly and actively induced others to directly infringe these patents, and that it has contributed to the direct infringement of these patents. (D.I. 25 at 4–6 ¶¶ 19–30.) On November 17, 2003, Smiths filed an Answer to MiniMed's First Amended Complaint, which contained five counterclaims, three of which are the Antitrust Counterclaims at issue here. (D.I. 28 at 24–28 ¶¶ 76–90.) Although Smiths initially requested damages in its Antitrust Counterclaims (Id. at 28 ¶ C), it has elected not to pursue such a claim for damages but continues to request injunctive relief (D.I. 244 at 21).

The Antitrust Counterclaims allege that MiniMed conditioned the sale of its infusion pumps on the purchase of its disposable infusion sets, in violation of 15 U.S.C. §§ 1, 14. (D.I. 28 at 24–25 ¶¶ 76–84.) Additionally, Smiths alleges that, by eliminating what had been a standard interface between infusion sets and its corresponding infusion pumps, MiniMed has attained "monopoly power, or has created the dangerous probability that MiniMed will obtain monopoly power" in the market for infusion sets, in violation of 15 U.S.C. § 2. (Id. at 26 ¶ 89.)

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 1338(a). For the reasons set forth herein, the Motion for Summary Judgment will be granted.

## II. Background [2]

MiniMed and Smiths are competitors in the manufacture and sale of insulin infusion pumps and sets. (D.I. 28 at 12–13 ¶ 7.) Infusion sets are disposable medical devices that attach to a diabetic's body to allow the delivery of insulin by injection into the body; infusion pumps are non-disposable devices that connect to infusion sets and control the delivery of the insulin through the sets. (Id. at 12–13 ¶ 7–8; 17 ¶ 27.) Infusion pumps last for years; however, infusion sets are typically replaced every two to three days. (Id. at 13 ¶ 8.) Traditionally, infusion sets have attached to infusion pumps through the use of a "luer lock." (Id. at 13 ¶ 9.)

MiniMed sold its first insulin pump in 1983. (Id. at 14 ¶ 10.) Between 1985 and 1998, MiniMed introduced six new types of insulin pumps. (Id. at 14–15 ¶¶ 11–17.) All of these pumps used the standard luer lock to connect with infusion sets. (Id.) In 2001 and 2003, MiniMed introduced three new types of insulin pumps, all of which MiniMed sold or sells under the trademark "Paradigm." (Id. at 16 ¶¶ 21–23.) Paradigm pumps do not use the traditional luer lock. (Id.) Instead, the Paradigm pump uses a proprietary system for locking the infusion set to the pump. (Id. at 16 ¶ 26.) Consequently, infusion sets with luer locks, such as those made by Smiths, cannot be used with MiniMed's new pump. (Id. at 16–17 ¶¶ 21–23, 30.)

MiniMed sought and was granted a patent for its new connection system. (D.I. 248, Ex. 31; U.S. Patent 6,585,695 B1 (the "'695 patent").) Although the new connection is protected by the '695 patent, one company, known as SpectRx, already makes and sells a Paradigm-compatible infusion set, and another company has announced plans to start selling such an infusion set in the near future. (D.I. 177, Ex. 13 at 70–71; Ex. 20 at 16–19; Ex. 30; Ex. 31.) MiniMed has given no assurances that it will not sue these companies in the future, but, at present, it has not filed suit against either of them for infringement of the '695 patent. (D.I. 269 at 75.) Smiths alleges that MiniMed's new, proprietary

---

2. The following rendition of the background information for my decision is cast in the light most favorable to the non-moving party, Smiths.

connection system, does not provide safety or efficacy advantages over a luer lock connection system. (D.I. 28 at 16 ¶ 26.)

With respect to MiniMed's motivation to stop using the luer lock connection system, Smiths states that, by 1999, a third, unrelated company was aggressively marketing infusion sets for use with other companies' infusion pumps. (*Id.* at 15 ¶¶ 19–20.) Smiths' counterclaims imply that it was this intense marketing of infusion sets that led MiniMed to change the design of its connection system to prevent their pumps from working with others' infusion sets. (*Id.* at 15–16 ¶¶ 19–24.) Finally, Smiths alleges that MiniMed's "share of the Pump Market has been and is approximately 75%." (*Id.* at 17 ¶ 29.)

## III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. In determining whether there is a triable issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However,

a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Inds. Co., Ltd.,* 475 U.S. at 587, 106 S.Ct. 1348 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. Discussion

### A. *Standing*

Smiths has asserted three antitrust counterclaims against MiniMed. The first two counterclaims are tying claims, one under 15 U.S.C. § 1 [3], and the other under 15 U.S.C. § 14 [4]. (D.I. 28 at 24–25 ¶¶ 76–

---

3. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

4. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States

or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement

84.) The third counterclaim is a claim of attempted monopolization under 15 U.S.C. § 2[5]. (*Id.* at 25–26 ¶¶ 85–90.) In the two tying claims, Smiths alleges that "[b]y creating a proprietary infusion set attachment that is incompatible with industry-standard disposable infusion sets, Minimed has conditioned the purchase" of its pumps on the "purchase of proprietary MiniMed disposable infusion sets." (*Id.* at 24 ¶ 77; *see also id.* at 25 ¶ 83.) With respect to the attempted monopolization claim, Smiths alleges that MiniMed "adopted incompatible proprietary infusion set attachments" for its pumps "with the specific intent to gain monopoly power ...." (*Id.* at 25 ¶ 87.)

■ Smiths argues that it has standing because it "has been severely constrained by Minimed's anticompetitive decision to abandon use of a luer lock connection system." (D.I. 244 at 22.) MiniMed responds that Smiths lacks standing in this case to allege an anticompetitive intent or effect in the use of the connection system protected by the '695 patent because Smiths has not produced and has no plans to produce a Paradigm-compatible infusion set. (D.I. 252 at 1–2.)

■ In order to establish standing in a case for injunctive relief, a plaintiff "must show: (1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust violation." *McCarthy v. Recordex Serv.*, 80 F.3d 842, 856 (3d Cir.1996) (internal citations omitted). As Smiths itself acknowledges, a competitor's standing to sue is premised on that competitor's having "manifested an intention to enter the business and ... [having] demonstrated his preparedness to do so." (D.I. 244 at 22) (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 885 (10th Cir.1997) (alteration not in original).) When the antitrust claim at issue is based upon the exclusionary use of a patent, the claimant must show that it was prepared to manufacture and sell the patented product, in order to show the necessary connection between the allegedly illegal conduct and the threatened injury. *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 882 (Fed.Cir.1985) (holding that a manufacturer of semi-conductor devices did not have standing to sue over the allegedly illegal use of a patent because it was not prepared to use the patented technology in the manufacture of its semiconductor devices and, therefore, there "was no connection between any conduct of ... [defendant] and ... [the plaintiff's] alleged 'harm' "). The undisputed facts presented in this Motion demonstrate that Smiths does not have standing to assert the Antitrust Counterclaims.

First and foremost, it must be noted that Smiths does not claim that it has been prevented from producing a Paradigm-compatible infusion set. Initially, Smiths appeared to be developing an argument that the '695 patent prevented it from marketing infusion sets to MiniMed's customers. In Smiths' answering brief, it implies that the '695 patent protecting MiniMed's new infusion sets prevented it from making a Paradigm-compatible infusion set. (*See* D.I. 244 at 23 (stating that

---

or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

5. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

"Smiths Medical should not have to run the gamut of patent infringement litigation in order to establish standing to pursue claims under the antitrust laws").) Some testimony in the record would support that position. Mr. Kalligher, a senior marketing manager at Smiths, stated that the '695 patent prevented Smiths from producing a Paradigm-compatible infusion set. (D.I. 248, Ex. 37 at 163–64.) Mr. Pope, who testified as a 30(b)(6) witness for Smiths, repeated that contention. (*See id.*, Ex. 15 at 46–47.) However, Smiths has since expressly disclaimed any argument that its Antitrust Counterclaims are based on the proprietary nature of MiniMed's patented connection system. (D.I. 269 at 79.) Instead, Smiths' arguments focus solely on MiniMed's decision to change the infusion set connection system it uses with its pumps.[6] That litigation tactic is consistent with Smiths' pre-litigation conduct, which included no effort whatever to design an infusion set that was both compatible with the Paradigm pump and did not infringe the '695 patent. (*See* D.I. 248, Ex. 15 at 75–76.)

In short, Smiths has essentially admitted that it has not been harmed by an inability to produce a Paradigm-compatible infusion set, but rather that it has been harmed by the inability to sell its luer lock infusion sets to Paradigm pump users. That such is its position is also made clear by the relief it seeks or, more precisely, does not seek. It nowhere asks that the '695 patent be held unenforceable.[7] If Smiths were truly claiming that MiniMed's use of the '695 patent poses a threat of harm, then presumably it would have asked that MiniMed be enjoined from enforcing the '695 patent. That it has not asked for that relief demonstrates that the '695 patent is not the basis for Smiths' Antitrust Counterclaims.

Smiths was not and is not prepared to produce a Paradigm-compatible infusion set. In an apparent admission that it cannot prove that it lost any sales to MiniMed, Smiths has decided not to pursue a claim of damages. (D.I. 244 at 21; *see also Indium Corp.*, 781 F.2d at 882 (holding that a plaintiff that was not prepared to manufacture a product has no standing to sue for antitrust damages resulting from the illegal use of a patent to block selling of that product).) It also follows, however, that Smiths has no standing to claim a

---

6. At oral argument Smiths' counsel confirmed that Smiths' Antitrust Counterclaims do not rely on MiniMed's use of its patent to prevent competitors from producing a *MiniMed* compatible infusion set. (D.I. 269 at 79.) Specifically, he stated that the "anti-competitive effects [at issue] fundamentally and first of all are flowing from the product change." (*Id.*) I then asked counsel "[s]o you are agreeing with your opponent that it's not the proprietary nature of their new interface that is at the heart of your claim of anti-competitive conduct. That ... if they hadn't patented it, that wouldn't make a difference. What really matters is it's no longer a luer lock and that is what is anti-competitive. Have I understood you?" (*Id.*) To which counsel responded "[t]hat's correct. That it is no longer a luer lock. That is what is anti-competitive." (*Id.*) Further, in its briefing Smiths states that "the only conduct that is challenged ... is Min-

iMed's decision to engineer incompatibility by intentionally designing luer locks out of the connection system for its Paradigm pumps." (D.I. 244 at 37.)

7. Instead, it vaguely asks that MiniMed be permanently enjoined "from continuing Minimed's violations of the Sherman Act, as authorized by ... the Clayton Act ...." (D.I. 28 at 28 ¶ B.) From the repeated assertions that it was injured by MiniMed's decision to abandon the luer lock, it appears that Smiths is asking that I enjoin MiniMed from selling its Paradigm pump and or the compatible infusion sets. (*See, e.g.,* D.I. 244 at 23) (stating that "MiniMed's anticompetitive conduct forecloses a substantial portion of the infusion set market to Smiths Medical's innovative infusion set").

right to injunctive relief. Again, as Smiths' own authority makes clear, to have standing Smiths must show that it "manifested an intention to enter the business and ... demonstrated [its] preparedness to do so." (D.I. 244 at 22 (citing *Sports Racing Servs.*, 131 F.3d at 885).) This it has failed to do.

## B. *Illegal Tying of Infusion Sets to the Purchase of Insulin Pumps*

■ Even if Smiths had standing, however, its Antitrust Counterclaims cannot stand. Smiths' first two counterclaims allege that MiniMed illegally tied the sale of its infusion pump to the sale of its infusion sets. The first counterclaim alleges a violation of § 1 of the Sherman Act and the second alleges a violation of § 3 of the Clayton Act. (D.I. 28 at 24–25 ¶¶ 76–84.) To bring a claim under either section, Smiths must prove that the tying arrangement is unlawful. *Mitel Corp. v. A & A Connections*, 1998 WL 136529, at *5, 1998 U.S. Dist. LEXIS 3576, at *13–14 (E.D.Pa. Mar. 20, 1998).

> A "tying arrangement" is unlawful where (1) the scheme in question involves two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased ...; (2) the tying product possesses sufficient economic power to appreciably restrain competition in the tied product market ...; and (3) a "not insubstantial" amount of com-

merce, must be affected by the arrangement.

*Id.* (internal citations omitted).

■ With respect to the first requirement, a plaintiff must "adequately plead ... that defendant has conditioned the sale of one separate product upon the sale of another product or service ...." *Medical Accessories Center, Inc. v. Sharplan Lasers, Inc.*, 1991 WL 212100, at *2, 1991 U.S. Dist. LEXIS 14771, at *5 (E.D.Pa. Oct. 15, 1991); *see Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir.1992) (holding that "[t]ying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)").

MiniMed argues that there is no tying in this case because "MiniMed has no contract or agreement through which users of its Paradigm pumps are required to purchase disposable sets for the Paradigm pump from MiniMed." (D.I. 206 at 28.) Smiths responds in its answering brief, that the sale of infusion pumps was not conditioned on the sale of infusion sets, but rather, because of coercion on the part of MiniMed, customers who purchased Paradigm pumps had no viable alternative but to purchase infusion sets from MiniMed because of the lack of available substitutes. (*See* D.I. 244 at 24 (stating that "the practical economic effect ... [of switching connection systems] is to force Paradigm pump customers to purchase MiniMed infusion sets).") [8]

---

**8.** As Smiths does not allege, and a reading of the record does not support, that MiniMed expressly required purchasers of insulin pumps to also purchase insulin sets, it appears that Smiths is alleging that MiniMed's change from the industry standard luer locks to its new design amounted to a functional tie that violated § 1 of the Sherman Act and § 3 of the Clayton Act. Functionally tying one product to another through the use of technology is often referred to as a "technological

tie." A technological tie can best be understood as a "technological interrelationship among complementary products." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542 (9th Cir.1983). Although the Third Circuit has not addressed this issue of so-called technological ties directly, its precedent can be read to imply that a decision to move away from one product type, *e.g.*, a luer lock infusion set, to another type is not, in and of itself, actionable. *See Steamfitters Lo-*

The test for tying requires conditioning the sale of one product on the sale of another, *see Town Sound,* 959 F.2d at 475, and, as the seller of the first product is the party imposing conditions on the purchaser, it is axiomatic that the conditioning in question be done by the seller. While the decision by MiniMed to stop using the luer lock connection system prevents Smiths from selling its current infusion set to Paradigm pump users, that action does not force or coerce Paradigm customers to purchase infusion sets from MiniMed. Such customers are free to purchase any infusion sets that are compatible with the Paradigm pump. Leaving aside the issue of the patent protection on MiniMed's new connection system, an issue which Smiths itself has chosen to leave aside, *see supra* at 5–9, Smiths could produce a compatible set, if it chose to, as other companies have done, and could try to sell the allegedly tied product directly to MiniMed's customers.[9] Smiths, however, has chosen not to produce such an infusion set. It cannot now be heard to claim that MiniMed's pump customers are coerced into buying infusion sets from MiniMed, when the lack of customer choice, if there is such, is partly a result of Smiths' own decision not to produce a compatible infusion set. Consequently, Smiths' tying claims based on MiniMed's decision to abandon the luer lock connection system must fail.

### C. *Attempted Monopolization*

 To prove attempted monopolization "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (internal citation omitted). To show the requisite anticompetitive conduct, it must be shown that the defendant's "power was used to foreclose competition." *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 191 (3d Cir.2005) (internal citation omitted). "The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or

cal *Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 926 (3d Cir.1999) (citing *Foremost Pro Color,* 703 F.2d at 544– 46) (stating that a "business's decision to not produce a product, simpliciter, is not a violation of the antitrust laws, and it is not clear whether even a concerted decision among all of the businesses in an industry to keep one of their new products from reaching consumers would be an antitrust violation").

9. Smiths relies on the principle that "[t]ie-ins are non-coercive, and therefore legal, only if the components are separately available to the customer on a basis as favorable as the tie-in arrangement," *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55, 62 (4th Cir.1969), and it asserts that the SpectRx infusion set is not offered "on a basis as favorable as the MiniMed Paradigm-compatible infusion sets." (D.I. 244 at 24 (internal quotations omitted).) The basis for that assertion is evidence that SpectRx's infusion set does not have hydrophobic vents and,

according to Smiths, "MiniMed customers must open their pump to potential water damage in order to" use the SpectRx infusion set. (*Id.* at 25.) This argument, however, misses the point and mistakes the import of the case Smiths cites. Smiths does not and cannot dispute that SpectRx is selling infusion sets compatible with MiniMed's Paradigm pump. There is no evidence that a features and benefits differential, assuming it exists as Smiths alleges, has eliminated the SpectRx infusion sets as an acceptable substitute in the market. On the contrary, the only evidence is that the SpectRx sets are being sold to Paradigm pump users. More importantly, Smiths can make a Paradigm compatible set of whatever quality it thinks best. Nothing in the *Advance Business Systems* case Smiths cites is directed at the quality of products competing with the allegedly tied product. Rather, that case addresses alternative ways in which allegedly tied products were sold. *See* 415 F.2d at 62.

severely restrict the market's ambit." *Id.* (internal citation omitted).

■ In this case, Smiths is not restricted from making and selling Paradigm-compatible infusion sets by MiniMed's decision to change its infusion set connection system. Smiths, however, argues that as a practical matter the market has been severely restricted by MiniMed's decision to change their connector system because they cannot sell their infusion sets to Paradigm users. (D.I. 244 at 32–33.) As evidence of this, Smiths cites various internal MiniMed documents. (*See* D.I. 247, Ex. 4 at MM026235; D.I. 248, Ex. 23 at MM204241, Ex. 27 at MM070099.) These documents might have supported an argument that MiniMed has used its '695 patent in an anticompetitive manner.[10] They do not, however, support Smiths' contention that the change in the connection system employed by MiniMed, in itself and without regard to the '695 patent, foreclosed the market in a meaningful way. In fact, one of the cited documents notes the relatively low barriers to entry in the infusion set market, stating that "[c]hallengers, aware of the multimillion-dollar stakes and eager to cut into MiniMed's market dominance, are anticipated because the barriers to entry are less daunting (it is technologically easier to design and manufacture a disposable set than an insulin pump)." (D.I. 247, Ex. 4 at MM026235.)

Further, Mr. Kellog, another witness for Smiths, testified that Smiths projected that in the 2004/2005 time period 100% of its sales of infusion sets would come from its own customers. (D.I. 177, Ex. 5 at 209.) Smiths also projected that, in 2007, 90% of its sales of infusion sets would still

be to its own customers, despite there continuing to be many MiniMed customers using non-Paradigm pumps that could use Smiths' infusion sets. (*Id.* at 215–16.) Mr. Pope stated that for Smiths "the easiest ... selling opportunities would have been selling to new Cozmo pump [, a Smith insulin pump,] users." (*Id.*, Ex. 6 at 331–32.) And Mr. Kellog agreed it would be challenging to get users of competitors' pumps to switch to their infusion sets, due to insurance requirements, the difficulty of identifying those prospective clients and marketing to them, and lastly the fact that "if they are happy with what they are using, people don't tend to change ...." (*Id.*, Ex. 5 at 208.) Finally, Mr. Pope testified that the approval to go forward with the new infusion sets was based on the understanding that they would only be sold to users of Smiths' pumps. (*Id.*, Ex. 10 at 226–27.)

As the above testimony makes clear, Smiths driving motivation in making and selling infusion sets was to serve the customers who purchased its pumps. While Smiths would likely have welcomed any additional customers it could have gained if MiniMed had not switched the design of its connector system, that product change cannot be said to have "severely restricted" Smiths' ability to sell its infusion sets. *See Dentsply,* 399 F.3d at 191. More to the point, however, if Smiths truly felt restricted by its inability to sell infusion sets to Paradigm pump customers, it could have made the decision to produce and sell compatible infusion sets to them,[11] as other infusion set manufactures have done.

To support its position that MiniMed's decision to change its infusion set connec-

---

10. I hasten to add that I make no such finding. I simply note that an argument that the use of the patent was anticompetitive presents a stark contrast to the argument Smiths actually makes.

11. Again this puts aside the issue of any barrier posed by the '695 patent, which Smiths has said is not the basis of its Antitrust Counterclaims.

tor system was anticompetitive, Smiths cites *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340 (Fed.Cir.1998). That case, however, addresses the type of issue that Smiths has abandoned in this case, namely, the unlawful use of a patent. *C.R. Bard* dealt with a company that changed the design of its biopsy gun to accept a new type of needle and then patented the needle and the interface between the gun and the needle. *Id.* at 1367. In *C.R. Bard,* there were three antitrust counterclaims. 157 F.3d at 1367. The first two claims related to "attempts to enforce … fraudulently procured patents" and unlawfully bringing suit for patent infringement when the plaintiff knew "its patents were invalid, unenforceable, or not infringed." *Id.* The third claim related to unlawfully leveraging "monopoly power … to obtain a competitive advantage." *Id.*

With respect to the third claim, the jury, through a special verdict form, found that there was a relevant market for the needles; that plaintiff-patentee "had monopoly power in that market," and "it had acquired or maintained its monopoly power in that market through restrictive or exclusionary conduct." *Id.* at 1382. The alleged unlawful conduct in that case was the modification of the gun "to accept *only* Bard needles." *Id.* at 1367 (emphasis added). In that case, it was the patents at suit that prevented competitors from selling needles that were compatible with Bard's guns.[12] *Id.* at 1348–49. It is perhaps possible that there are other ways to create an exclusive market, such as creating a product that is not susceptible to reverse engineering. In the case at bar, however, there is no such claim. Moreover, SpectRx's infusion set, which is com-

patible with the Paradigm pump, highlights the fact the Paradigm pump accepts infusion sets others than MiniMed's.

There is language in the majority's opinion that on first blush would appear to support Smiths' case, namely that Bard's reason for modifying its gun was "to raise the cost of entry to potential makers of replacement needles, to make doctors apprehensive about using non-Bard needles, and to preclude the use of 'copycat' needles." *Id.* at 1382. Taken in context, however, the above quoted language is an effort on the part of the majority to refute the premise of the dissent's argument for overturning the antitrust verdict, which was that the modification to "Bard's Biopsy gun was an 'improvement.' " *Id.* Consequently, this language should be understood in relation to Bard's use of its patents and not be considered as referencing conduct that, standing alone, would necessitate a finding of predatory or exclusionary conduct. Therefore, the present case is fundamentally different, as Smiths has not made and apparently has no plans to make a product which may infringe the '695 patent, which has not been asserted against Smiths in this case.

With few, narrow exceptions not applicable in the present case, the antitrust laws contain "no duty to aid competitors." *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 411, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). Indeed, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Id.* at 407, 124 S.Ct. 872 (emphasis omitted). Here, Smiths'

---

**12.** Standing was not an issue in that case because an "individual defendant raising a misuse defense need not show that he was personally harmed by the abusive practice"

when he is being sued for infringement of the same patent. 6–19 CHISUM ON PATENTS § 19.04, note 5 (2005).

Antitrust Counterclaims, if permitted to stand, would undermine that fundamental goal of encouraging innovation. Smiths argues that the design changes to the connection system undertaken by MiniMed could have been accomplished without removing the luer lock. (D.I. 244 at 37.) Absent evidence of anticompetitive conduct, however, it is not the role of the courts to determine how companies should innovate. On this record, Smiths' remedy for the competitive disadvantage it says it faces is in the marketplace, not in court.

## V. Conclusion

For the reasons set forth, MiniMed's Motion for Summary Judgment (D.I.175) will be granted. Its earlier Motion to Dismiss or in the alternative to Bifurcate and Stay Discovery and Trial of Defendant's Antitrust Counterclaims (D.I.31) will be denied as moot. An appropriate order will follow.

## MEMORANDUM ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Motion for Summary Judgment (D.I.175) filed by Medtronic MiniMed Inc. ("MiniMed") will be GRANTED. MiniMed's earlier Motion to Dismiss or in the alternative to Bifurcate and Stay Discovery and Trial of Defendant's Antitrust Counterclaims (D.I.31) will be denied as MOOT.